JULIE A. GOLDBERG, ESQ.
California Bar No. 235565
**GOLDBERG & ASSOCIATES**
5586 Broadway Ave, Third Floor
Bronx, NY 10463
Telephone: (718) 432-1022
Facsimile: (718) 432-1044
Email: ecf@goldbergimmigration.com
*Attorney for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MOHAMED ALUMARI; YOUSEF ALUMARI; NOOR ALUMARI;, <br><br> Plaintiffs, <br><br> vs. <br><br> ANTONY BLINKEN, U.S. SECRETARY OF STATE; U.S. DEPARTMENT OF STATE; RENA BITTER, ASSISTANT SECRETARY FOR CONSULAR AFFAIRS; JULIE M. STUFFT, DEPUTY ASSISTANT SECRETARY FOR VISA SERVICES  CONSULAR CHIEF, U.S. EMBASSY IN DJIBOUTI; U.S. EMBASSY DJIBOUTI, <br><br> Defendants. | Case No.: <br><br><br> **COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF** |

## COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff MOHAMED ALUMARI, YOUSEF ALUMARI, and NOOR ALUMARI by their undersigned counsel, hereby allege as follows:

### PRELIMINARY STATEMENT

1. Plaintiff Mohamed Alumari (hereinafter "Mr. Alumari" or "Plaintiff"), Yousef Alumari and Noori Alumari ("Plaintiff-Beneficiaries") bring this challenge under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 and the Mandamus Act, 28 U.S.C. § 1361, the Immigration and Nationality Act's ("INA")non-discrimination clause,a nd the

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 1

Fifth Amendment of the United States Constitution, challenging Defendants' discriminatory policies and practices relating to the adjudication of Platiniff's visa applications and adjudication of visa applications filed by individuals of Yemeni race, ethnicity, and/or national origin; as well as the refusal and/or failure to adjudicate Plaintiff-Beneficiaries' visa applications in accordance with the Immigration and Nationality Act, its implementing regulations, and legal standards as well as Department of State ("DOS") regulations, rules and procedures.

2. Specifically, Plaintiffs seek an order from this Court compelling the United States Embassy in Djibouti to adjudicate to completion Plaintiffs visas in good faith of : visa application numbers DJI2019671018 (Yousef Ali Alumari and his derivative family members) and DJI2019671025 (Noor Ali Alumari and her derivative family members).

3. Mr. Alumari is a United States citizen (Exhibit A), who sponsored his two siblings under the family unification policies Congress implemented through the INA.

4. Based on Mr. Alumari's sponsor of his siblings, each sibling is now eligible to apply for a visa for themselves and their immediate family members - spouse and children - at a United States Embassy or consulate.

5. As Plaintiff's siblings are nationals of Yemen, the DOS has designated the United States Embassy in Djibouti as the Embassy responsible for processing and adjudicating visa applications for Yemeni residents and nationals of Yemen.

6. Recently – as Plaintiff-Beneficiaries continue to reside in Yemen – derivative beneficiary Ebrahim Mohammed Obaid was murdered by rebels at a checkpoint while traveling to a wedding outside of Sana'a. (*See*, Ex. CC - Declaration of Mohamed Alumari).

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 2

7. Since rebels control most of Yemen, including Sana'a, the Alumari family is unable to obtain any legal recourse for the death of Ebrahima and are in danger of retaliation if they were to even try. (*See, e.g.* Exhibit EE - U.S. Department of State, YEMEN 2022 HUMAN RIGHTS REPORT, "The internationally recognized government's control was limited in large portions of the country's territory due to influence exerted by the Iran-backed Ansar Allah movement (known colloquially as the Houthis) and other nonstate actors.").

8. Plaintiff's brother Yousef, appeared for a visa interview at the United States Embassy in Djibouti on July 25, 2021 where his case was placed in Administrative Processing. (Exhibit N, O).

9. On August 31, 2021, Plaintiff received an email from the Djibouti Embassy stating that:

> Administrative processing has been completed on your case. You may drop off your passport Sunday- Wednesday at 3pm to continue processing your visa.

(Exhibit O).

10. Accordingly, Yousef submitted the passports for himself and his wife Ibtasam Musaid Nagi and their minor child L.Y.A.

11. However, Defendants have not issued Yousef and his family's visas even though Defendants have completed administrative processing close to 2 years ago and now insist that Yousef is inadmissible under 8 U.S.C. § 1182(a)(6)(C)(i), even though under black letter law such a finding is meritless.

12. Defendants' denial of Youseff's visa was done in accordance with Defendants separate standard for inadmissibility under 8 U.S.C. § 1182(a)(6)(C)(i) which is applied to Yemeni visa applicants.

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 3

13.     The separate standard applied only to Yemeni visa applicants has its roots in Defendants' decades-long initiative to stymy, deter, or otherwise prevent Yemeni immigration to the United States under the INA's family unification policies.

14.     The policy seeks to enforce the "fraudulent until proven otherwise" first developed at the now-closed United States Embassy in Sana'a Yemen. *See,* DOS Cable (09 SANAA 1729).

15.     Since that time, Defendants entirely suspected visa processing for Yemeni nationals between the years 2017 and 2020; developed "extreme vetting" procedure applied to Yemeni visa applicants, including the use of Form DS-5535; and have developed standards, policies, and procedures for visa adjudications which subject

16.     The basis for the 8 U.S.C. § 1182(a)(6)(C)(i) finding is related to a 2004 B-2 tourist visa which was denied pursuant to 8 U.S.C. § 1184(b) (INA 214(b)), which simply requires non-immigrant visa applicants to establish that they intend to remain non-immigrants throughout their travel to the United States.

17.     Under DOS policy and controlling legal principles, "[i]f an alien was found **ineligible for a visa under a different and unrelated ground of ineligibility (for example under INA 214(b))** a **subsequent discovery** that the alien **had misrepresented certain aspects of the case** *would not be considered material* **since the misrepresented facts did not tend to lead you into making an erroneous conclusion**."  9 FAM 302.9-4(B)(5)(c)(2)(a).

18.     Thus, any misrepresentation made by Plaintiffs in the denial of the 2004 B-2 visa applications is necessarily immaterial under 9 FAM 302.9-4(B)(5)(c)(2)(a), which itself enforces controlling legal principles established by the Board of Immigration Appeals and the federal courts interpreting the INA.

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 4

19. Further, Defendants continue to insist that Plaintiff Youseff is eligible for an inadmissibility waiver; even though such a waiver only applies to individuals who have a United States citizen or Legal Permanent Resident spouse or parent.

20. Thus, even after completing administrative processing Defendants continue to delay and unlawfully withhold the performance of the most basic functions relating to the visa application process, which is simply issuing visas which have already been approved.

21. Similarly, Mr. Alumari's sister – Noor Ali Alumari – and her family, who was also sponsored by Mr. Alumari under the INA's family unification provisions, have also been delayed in the adjudication of their visa applications and issuance of their visas.

22. While there is obviously nothing which can repair the harm done to the Alumari family by Ebrahim's murder, simply adjudicating and issuing their visas and allowing the family to travel to safety in the United States – where they should have already been residing – to escape the danger they now face in Yemen will at least prevent further harm from being inflicted on the Alumari's.

23. Accordingly, Plaintiff seeks an order from this Court compelling the Djibouti Embassy to fully adjudicate and issue the Alumari family's visa applications.

**JURISDICTION**

24. Jurisdiction is proper under 28 U.S.C. §§ 1331, 1361, and 2201, and 5 U.S.C. §§ 702–706.

25. Plaintiffs have no administrative remedies available to redress their grievances described in this Complaint. This action challenges Defendants' procedural policies, practices, interpretations of law, and their actions or failures to act, not the discretionary granting

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 5

or denial of individual petitions or applications. Therefore, the jurisdictional limitations under 5 U.S.C. § 701(a)(2) do not preclude this action.

## VENUE

26.    Venue is proper in the Eastern District of California pursuant to 28 U.S.C. § 1391(e)(1) on the following grounds: Defendants are officers or employees of the United States or agencies thereof sued in their official capacities for acts under color of legal authority, Plaintiff Mohamed Alumari resides in the district, and no real property is involved in the action.

## PARTIES

27.    Plaintiff Mohamed Ali Alumari  is a United States Citizen. (Exhibit A). Mr. Alumari is the brother and Petitioner/Sponsor for his brother Yousef and sister Noor and their families, whose visa applications remain pending before the Defendants.  who seek the issuance of their immigrant visas. Mr. Alumari resides in Bakersfield, California.

28.    Defendant Antony Blinken is the United States Secretary of State. As Secretary of the executive department that oversees the National Visa Center and the Bureau of Consular Affairs, Defendant Blinken is responsible for creating and enforcing the policies and regulations governing the consular processing of immigrant visa petitions in U.S. Embassies and Consulates worldwide. Defendant Blinken has the ultimate decision-making authority over all DOS matters alleged herein. Defendant Blinken is sued in his official capacity.

29.    Defendant U.S. Department of State ("DOS") is the executive agency charged with administering United States foreign policy worldwide, including immigration policies. DOS's components include the National Visa Center ("NVC") and the Bureau of Consular Affairs ("CA"). The NVC handles pre-processing of approved immigrant visa petitions

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 6

before sending the petition to a U.S. Embassy for further processing. The CA administers the laws, regulations, and policies relating to consular services and immigration worldwide.

30.    Defendant Rena Bitter is the current Assistant Secretary for the Bureau of Consular Affairs. As Assistant Secretary for Consular Affairs, Defendant Bitter is responsible for administering the laws, regulations, and policies relating to consular services and immigration at U.S. Embassies and Consulates worldwide. Defendant Bitter is sued in her official capacity.

31.    Defendant Julie M. Stufft is the Deputy Assistant Secretary for Visa Services for the Bureau of Consular Affairs. As Deputy Assistant Secretary for Visa Services, Defendant Stufft is responsible for managing the administration of immigrant visa processing at U.S. Embassies and Consulates worldwide. Defendant Stufft is sued in her official capacity.

32.    Defendant Consular Chief is the highest-ranking official at the U.S. Embassy in Djibouti. Defendant Consular Chief oversees and manages the processing of immigrant visas at the U.S. Embassy Djibouti.  Defendant Consular Chief is sued in their official capacity.

33.    Defendant United States Embassy in Djibouti is the consular processing post designated with the jurisdiction and possessing the duty to process immigrant visa applications filed by citizens of Yemen.

## FACTUAL AND LEGAL BACKGROUND

### Congress' Adoption of the Current Policy of Family Reunification

34.    In 1965, Congress amended the Immigration and Nationality Act to adopt a federal immigration policy that served two purposes: reunite families and remove national origin quotas.

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 7

35.     The goal of family unity has been a cornerstone of U.S. immigration policy for nearly a century. Beginning in 1921, Congress expanded the categories of family members of citizens and Legal Permanent Residents able to seek admission or status adjustment through their relatives to further the "well-established policy of maintaining family unity." *Revision of Immigration and Nationality Laws*, S. Rep. No. 1137, at 16 (1952).

36.     In 1957, Congress amended the INA to strengthen the family unification provision of the INA, specifically focusing on reuniting parents with their children. *See*, *Immigration Service v. Errico*, 385 U.S. 214, 220 n.9 (1966)( "The legislative history of the Immigration and Nationality Act clearly indicates that the Congress intended to provide for a liberal treatment of children and was concerned with the problem of keeping families of United States citizens and immigrants united." (*quoting* H.R. Rep. No. 1199, 85th Cong., 1st Sess., p. 7 (1957); *s*ee also S. Rep. No. 1057, 85th Cong., 1st Sess. (1957)).

37.     The Immigration Act of 1965, Pub. L. No. 89-236, 79 Stat. 911, eliminated racially discriminatory national-origin quotas that had been in place since the 1920s and established family ties as the primary means of immigrating to the United States. In so doing, Congress advanced two foundational policy goals: the promotion of a race-neutral policy in the immigration admissions process and the primacy of family unification. *See*,Gabriel J. Chin, *The Civil Rights Revolution Comes to Immigration Law: A New Look at the Immigration and Nationality Act of 1965*, 75 N.C.L. REV. 273, 297 (1996) (explaining that the 1965 Immigration Act  adopted race-neutrality as a principle of federal immigration policy); Kerry Abrams, *What Makes the Family Special?*, 80 U. CHI. L. REV. 7, 14 (2013) (stating that the 1965 Immigration Act established the current system of family-based immigration law).

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 8

38.     In fact, the 1965 Immigration Act, Congress adopted an immigration policy designed to "first reunite families," H.R. Rep. No. 89-745, at 12 (1965). Congress has never retreated from that policy.

39.     Most importantly, the 1965 Immigration Act's policy of race and national origin neutrality removed existing impediments to Congress's family reunification policy.

40.     Prior to the 1965 Act, family-based immigration was coupled with national origin quotas. *See* Emergency Quota Act L. No. 67-5, § 2(d), 42 Stat. 5, 6 (1921) ("[I]n the enforcement of this Act preference shall be given so far as possible to the wives, parents, brothers, sisters, children under eighteen years of age, and fiancées [of United States citizens and legal residents]."); *see also, id*. at § 2(a), 42 Stat. at 5 (providing "[t]hat the number of aliens of any nationality who may be admitted under the immigration laws of the United States [annually] shall be limited to 3 per centum of the number or foreign-born persons of such nationality resident of the United States as determined by the United States census of 1910").

41.     After the Emergency Quota Act, Congress passed the Immigration Act of 1924 (Pub. L. No. 68-139, 43 Stat. 153), which limited the family-preference and national origin quota system. *See id*. § 8, 43 Stat. 153, 155 (limiting the annual quota to two percent of the number of foreign-born individuals of such nationality in the United States as of 1890 and providing for a minimum quota of one hundred individuals per nationality).

42.     As the State Department's Office of Historian has stated: "The Immigration Act of 1924 limited the number of immigrants allowed entry into the United States through a national origins quota. The quota provided immigration visas to two percent of the total number of people of each nationality in the United States as of the 1890 national census. It completely excluded immigrants from Asia." Office of the Historian, U.S. Dep't of State, *The Immigration*

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 9

*Act of 1924 (The Johnson-Reed Act)*, available at https://history.state.gov/milestones/1921-1936/immigration-act (last accessed May 24, 2023).

43. "When the congressional debate over immigration began in 1924, the quota system was so well-established that no one questioned whether to maintain it, but rather discussed how to adjust it. Though there were advocates for raising quotas and allowing more people to enter, the champions of restriction triumphed. They created a plan that lowered the existing quota from three to two percent of the foreign-born population. They also pushed back the year on which quota calculations were based from 1910 to 1890." *Id.*

44. "Another change to the quota altered the basis of the quota calculations. The quota had been based on the number of people born outside of the United States, or the number of immigrants in the United States. The new law traced the origins of the whole of the U.S. population, including natural-born citizens. The new quota calculations included large numbers of people of British descent whose families had long resided in the United States. As a result, the percentage of visas available to individuals from the British Isles and Western Europe increased, but newer immigration from other areas like Southern and Eastern Europe was limited." *Id.*

45. "The 1924 Immigration Act also included a provision excluding from entry any alien who by virtue of race or nationality was ineligible for citizenship. Existing nationality laws dating from 1790 and 1870 excluded people of Asian lineage from naturalizing. As a result, the 1924 Act meant that even Asians not previously prevented from immigrating – [] Japanese in particular – would no longer be admitted to the United States." *Id.*

46. Additionally, the 1924 Immigration Act limited family-based immigration law to the nuclear family by removing preference categories for adult children and siblings of

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 10

U.S. citizens that were previously part of the 1921 Act. *See,* Abrams, *What Makes the Family Special?*, 80 U. CHI. L. REV. 7, 13 (2013).

47.     Furthermore, from 1924 until 1952, persons who were racially ineligible for citizenship were inadmissible to the United States and thus restricted families in the United to those races and nationalities eligible for naturalization. *See, e.g.*, Rose Cuison Villazor, *The Other Loving: Uncovering the Government's Racial Regulation of Marriage*, 86 N.Y.U. L. REV. 1361 (2011).

48.     In 1952, Congress adopted the Immigration and Nationality Act, Pub. L. No. 82-414, 66 Stat. 163,  which abolished racial restrictions to naturalization.

49.     The 1952 INA mainted national origin quotas, but once again made children and spouses "non-quota" *(Id* at § 101(a)(27)(A) 66 Stat. 163, 169); set aside thirty percent of the visas for parents of citizens and twenty percent were allocated to spouses and children of lawful permanent residents;  re-established visa categories for siblings and adult children (*Id.* at § 203(a)(4), 66 Stat. 178-79);  and created preference categories for spouses and children of lawful permanent residents. (*Id.* at § 203(a)(3), 66 Stat. 178).

50.      However, Siblings and adult children were placed at the bottom of the preference categories and were not guaranteed visa slots but instead were entitled only to any unused visas. (*Id.* at § 203(a)(4), 182 Stat. 178-79 (providing that "[a]ny portion of the quota for each quota area for [a given] year not required for the issuance of visas to [all other preference classes]" shall be made available to siblings and adult children)).

51.     However, Congress maintained the national origins quota system from Immigration Act of 1924. (*See id.* at §201).

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 11

52.    In 1965, Congress adopted the current framework for federal immigration policy: Immigration and Nationality Act, Pub. L. No. 89-236, 79 Stat. 911 (1965). In the 1965 Act, Congress explicitly prohibited discrimination on the basis of "race, sex, nationality, place of birth, or place of residence."(*Id.*, sec. 2, § 202(a), 79 Stat. 911, 911). Congress further revoked the national origin quota system and replaced it with a worldwide limit of 170,000 visas for the Eastern Hemisphere and 120,000 for the Western Hemisphere. *See id.*, sec. 1, § 201(a)(ii), 79 Stat. 911, 911).

53.    Today, the cap is 480,000 visas per year for family-preference immigrants. *See* 8 U.S.C. § 1151(c)(1)(A)(i) The worldwide level of family-sponsored immigrants under this subsection for a fiscal year is … 480,000" but not "less than 226,000"8 U.S.C. § 1151(c)(1)(B)(ii).

54.    Additionally, Congress established that the principle means of immigrating to the United States was through family ties, specifically "immediate relatives" were subject to no numeral limitations. *See*, 1965 Immigration Act, sec. 1, §201(a), 79 Stat. 911, 911; *see also*, 8 U.S.C. § 1151(b) "Aliens not subject to direct numerical limitations"; *id.* at (2)(A)(i) "IMMEDIATE RELATIVES.- For purposes of this subsection, the term "immediate relatives" means the children, spouses, and parents of a citizen of the United States, except that, in the case of parents, such citizens shall be at least 21 years of age. In the case of an alien who was the spouse of a citizen of the United States and was not legally separated from the citizen at the time of the citizen's death, the alien (and each child of the alien) shall be considered, for purposes of this subsection, to remain an immediate relative after the date of the citizen's death but only if the spouse files a petition under section 1154(a)(1)(A)(ii) of this title within 2 years after such date and only until the date the spouse remarries.").

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 12

55.    The 1965 Act also set aside seventy-five percent of available visas for relatives of U.S. citizens and lawful permanent residents, rather than based on employment or employment-related skills. *See id.*, sec. 3, §203(a), 79 Stat. 911, 912-15 (specifying to family preference categories visa allotment); *see also*, 8 U.S.C. § 1151 (d)(1)(A) "The worldwide level of employment-based immigrants under this subsection for a fiscal year is equal to … 140,000."

56.    Today, the 1965 Act framework is maintained by providing an annual worldwide level of 675,000 visas per year. *See generally* 8 U.S.C. § 1151(a):  family-sponsored visas (480,000), employment- based visas (140,000), "diversity immigrant" visas (55,000)).

57.    However, "immediate relatives" remain unrestricted by visa totals.

58.    Further, each country is limited to 7 percent of the worldwide level (*id.* § 1152(a)(2), there are exceptions which encourage family unity, for example, 75 percent of the visas for spouses and children of lawful permanent residents are not subject to the per-country totals.*See id*. § 1152(a)(4)(A)

59.    The allocation of 226,000 visas for family- sponsored immigrants is subdivided as follows: 23,400 (F1 or first preference); 114,200 (F2 or second preference, with 77 percent reserved for spouses and children of lawful permanent residents); 23,4000 (F3 or third preference); and 65,000 (F4 or fourth preference).

60.    Finally, Congress's policy of  non-discrimination is still implemented today through the the INA's "nondiscrimination" clause  which provides:

**Nondiscrimination**
A) Except as specifically provided in paragraph (2) and in sections 1101(a)(27), 1151(b)(2)(A)(i), and 1153 of this title, no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence.
8 USC §1152(a).

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 13

**United States Laws Relating Visa Adjudication**

61.    A visa application which is only fully adjudicated when it is issued or refused pursuant to a ground of inadmissibility found under 8 U.S.C. § 1182(a) (INA 212(a).

62.    Administrative processing or temporary refusals pursuant to 8 U.S.C. § 1201(g) (INA 221(g) are not final visa adjudications and thus do not relieve Defendants of their non-discretionary duty to either issue or refuse a visa application.Defendants have a non discretionary duty to adjudicate to completion all visa applications. *See*, 8 U.S.C. § 1202(b) ("All immigrant visa applications ***shall be*** reviewed and ***adjudicated by a consular officer***").

63.    DOS regulations clarify that a visa adjudication requires that:

"When a visa application has been properly completed and executed before a consular officer in accordance with the provisions of the INA and the implementing regulations, the consular officer must issue the visa, refuse the visa under INA 212(a) or 221(g) or other applicable law or, pursuant to an outstanding order under INA 243(d), discontinue granting the visa.""

22 CFR § 42.81.

64.    However, Defendants regulation allowing for refusal pursuant to INA 221(g)  exceed the authority of the statutory grant of authority which the regulation implements, which is 8 U.S.C.  §  1201(g) itself.

65.    In cases where a consular officer refuses a visa,  8 U.S.C.  §  1201(g) provides the statutory mechanism for issuance of the denial.

66.    8 U.S.C.  §  1201(g) provides the statutory procedure for refusing visa applications; it does not provide the substantive statutory grounds upon which visa applications may be refused.

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 14

67.     Rather – except in cases where there are defects in the application itself, i.e., mistakes or missing information, 1201(g) requires that the visa refusal be based  "ineligibility to "under section 1182." *See*, *Trump v. Hawaii*, 138 S. Ct. 2392, 2414  (2018) ("[s]ection 1182 defines the pool of individuals who are admissible to the United States" and "any alien who is inadmissible under § 1182 [] is screened out as 'ineligible to receive a visa'" under 1201(g)(1) or (3))  (citing § 1201(g)).

68.     First a visa may be refused where " it appears to the consular officer, from statements in the application, or in the papers submitted therewith, that such alien is ineligible to receive a visa or such other documentation under section 1182 of this title, or any other provision of law[.]" 8 U.S.C.  § 1201(g)(1).

69.     From  1201(g)(1)'s  unambiguous  such  a  refusal  must  be  based  on "statements ***in the application***, or in the ***papers submitted therewith***" that the applicant  "is ineligible to receive a visa or such other documentation under section 1182."

70.     From  1201(g)(1)'s  unambiguous  such  a  refusal  must  be  based  on "statements ***in the application***, or in the ***papers submitted therewith***" that the applicant  "is ineligible to receive a visa or such other documentation under section 1182."

71.     "The categories of persons deemed ineligible to receive a visa pursuant to § 1201(g) appear in § 1182(a)". *Gomez v. Trump*, 485 F. Supp. 3d 145, 191 (D.D.C. 2020)(*citing Castaneda-Gonzalez v. Immigr. & Naturalization Serv.*, 564 F.2d 417, 426 (D.C. Cir. 1977) (explaining that § 1201(g) "directs [consular officers] not to issue visas to any alien who falls within one of the excludable classes described in [ 8 U.S.C. § 1182(a) ]"); *see also*, *Trump v. Hawaii*, 138 S. Ct. 2392, 2414  (2018) ("[s]ection 1182 defines the pool of individuals who are

admissible to the United States" and "any alien who is inadmissible under § 1182 [] is screened out as 'ineligible to receive a visa'" under 1201(g)(1) or (3))  (citing § 1201(g)).

72.     Thus a denial pursuant to 1201(g)(1) requires reference to "the application" or "papers submitted therewith" that establish ineligibility under one of section 1182(a)'s grounds of inadmissibility.

73.     The second ground for refusal is where the application itself "*fails to comply with the provisions of **this chapter**, or the regulations issued thereunder.*" § 1201(g)(2)("the application *fails to comply with the provisions of this chapter,* or the regulations issued thereunder").

74.     Such a refusal, again like 1201(g)(1) is based purely on the application material themselves failing to comply with 8 U.S.C. Chapter 12 requirements

75.     Finally, the third ground for visa refusal or denial is where "the consular officer knows or has reason to believe that such alien is ineligible to receive a visa or such other documentation under section 1182 of this title, or any other provision of law." § 1201(g)(3).

76.     Like section 1201(g)(1), section 1201(g)(3) also requires reference to a substantive ground for inadmissibility/ineligibility that forms the basis upon which the visa is actually denied.

77.     The regulations adopted by the Department of State reify the statutory arrangement.

78.     First, the regulations provide that: "A visa can be refused only upon a ground specifically set out in the law." 22 CFR § 40.6.

79.     The regulations further explain that, "the term 'reason to believe', as used in INA 221(g), shall be considered to require a determination based upon facts or circumstances

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 16

which would lead a reasonable person to conclude that the applicant is ineligible to receive a visa as provided in the  INA and as implemented by the regulations." 22 CFR § 40.6.

80.    Additionally, the regulations require that "Consideration shall be given to any evidence submitted indicating that the ground for a prior refusal of a visa may no longer exist." 22 CFR § 40.6.

81.    As to 1201(g)'s requirement that the substantive grounds for visa denials be based on grounds contained in section 1182, the regulations provide further clarification, stating: "***Subparts B through L*** describe classes of inadmissible aliens ***who are ineligible to receive visas*** and who shall be ineligible for admission into the United States, except as otherwise provided in the Immigration and Nationality Act, as amended."  22 CFR § 40.9 (titled "Classes of inadmissible aliens").

82.    Subparts B through L of 22 CFR Part 40 then mirrors 8 U.S.C. 1182(a)'s specificai statutory grounds of inadmissibility/ineligibility. Subpart B—Medical Grounds of Ineligibility (§§ 40.11 - 40.12–40.19)(*compare with*, 8 U.S.C. § 1182(a)(1) Health-related grounds; Subpart C—Criminal and Related Grounds—Conviction of Certain Crimes (§§ 40.21 - 40.26–40.29)(*compare with*, 8 U.S.C. § 1182(a)(2) Criminal and related grounds); Subpart D—Security and Related Grounds (§§ 40.31 - 40.36–40.39)(*compare with*, 8 U.S.C. § 1182(a)(3) Security and related grounds); Subpart E—Public Charge (§§ 40.41 - 40.42–40.49)(*compare with*, 8 U.S.C. § 1182(a)(4) Public charge); Subpart F—Labor Certification and Qualification for Certain Immigrants (§§ 40.51 - 40.54–40.59)(*compare with*, 8 U.S.C. § 1182(a)(5) Labor certification and qualifications for certain immigrants); Subpart G—Illegal Entrants and Immigration Violators (§§ 40.61 - 40.69)(*compare with*, 8 U.S.C. § 1182(a)(6) Illegal entrants and immigration violators); Subpart H—Documentation Requirements (§§ 40.71 - 40.73–

40.79)(*compare with*, 8 U.S.C. § 1182(a)(7) Documentation requirements); Subpart I—Ineligible for Citizenship. (§§ 40.81 - 40.83–40.89)(*compare with* 8 U.S.C. § 1182(a)(8) Ineligible for citizenship); Subpart J—Aliens Previously Removed (§§ 40.91 - 40.94–40.99) (*compare with* 8 U.S.C. § 1182(a)(6)(A)(B) "Aliens previously deported" and "Certain aliens previously removed"; Subpart K—Miscellaneous (§§ 40.101 - 40.106–40.110)(*compare with* 8 U.S.C. § 1182(a(9) Miscellaneous);

83.     Subpart L "Failure to Comply with INA (§§ 40.201 - 40.207–40.210)" is not related to grounds of inadmissibility, but rather, at is relates to family-based immigrant application, it mostly enforces 1201(g)(2), by providing a list of grounds that are sufficient for denial of an immigrant visa pursuant to 1201(g)(1). See, 22 CFR § 40.201(a).

84.     Specifically, "[t]he consular officer shall refuse an alien's visa application under INA 221(g)(2) as failing to comply with the provisions of INA or the implementing regulations if:

1) The applicant fails to furnish information as required by law or regulations;

(2) The application contains a false or incorrect statement other than one which would constitute a ground of ineligibility under INA 212(a)(6)(C);

(3) The application is not supported by the documents required by law or regulations;

(4) The applicant refuses to be fingerprinted as required by regulations;

(5) The necessary fee is not paid for the issuance of the visa or, in the case of an immigrant visa, for the application therefor;

(6) In the case of an immigrant visa application, the alien fails to swear to, or affirm, the application before the consular officer; or

(7) The application otherwise fails to meet specific requirements of law or regulations for reasons for which the alien is responsible.

22 CFR § 40.201(a).

85.    Notably, 22 CFR § 40.201(a) does not contain any requirement that DOS or a consular officer may unilaterally require the submission of for Form DS-5536, as only such information required by "law or regulations" constitutes legal grounds for denial of visa pursuant to 1201(g)(2).

86.    Finally, 8 U.S.C. 1182(b) (titled "**Notices of denials")** clarifies that the grounds for visa denial are contained in 1182(a), stating that:

> *If an alien's application for a visa,* for admission to the United States, or for adjustment of status *is denied by* an immigration or *consular officer because the officer determines the alien to be excludable under subsection (a) of this section*, the officer shall provide the alien with a timely written notice that -
>
> (1) states the determination, and
> (2) lists the specific provision or provisions of law under which the alien is excludable or ineligible for entry or adjustment of status.

87.    Thus, both 1201(g)(1),(3) require visa denials to be based on substantive grounds of inadmissibility found in 1182(a), while 1201(g)(2) only serves as a basis for visa denial in cases where the applications paper themselves fail to comply with the requirements of 22 CFR § 40.201(a).

88.    Nonetheless, here, Defendants have refused to adjudicate Plaintiffs' visa application based on requirements not found in either "law or regulation".

89.    Indeed, the United States Foreign Affairs Manual also states the requirement for a clear code section basis for visa refusals.

90.    9 FAM 301.1-2 states as follows:

91.    "Refusing a Visa:  A visa can be refused only upon a ground specifically set out in law or implementing regulations.  You are required to decide based upon facts or

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 19

circumstances that would lead a reasonable person to conclude that the applicant is ineligible to receive a visa as provided in the INA and as implemented by the regulations."

92.    9 FAM 504.11-2(a) further states: "There are no exceptions to the rule that once a visa application has been properly completed and executed before a consular officer, a visa must be either issued or refused. See 9 FAM 504.9-2."

93.    9 FAM 504.11-2(a) further requires that "all consular sections should follow the identical refusal procedures and report refusals the same way in their required reports of visas issued and refused.  See 9 FAM 504.3-2."

94.    Thus,  "Accordingly, any applicant to whom a visa is not issued by the end of the working day on which the application is made, or by the end of the next working day if it is normal procedure to issue visas to some or all applicants the following day, must be found ineligible under one or more provisions of INA 212(a), 212(e), or 221(g)." *Id.*

95.    9 FAM 504.11-2(a) emphasizes that:

INA 221(g) is not to be used when a provision of INA 212(a) is applicable.  This requirement to find an applicant ineligible when a visa is not issued applies even when:

(1)  (U) A case is medically deferred;
(2)  (U) You request an AO from the Department;
(3)  (U) You decide to make additional local inquiries or conduct a full investigation; or
(4)  (U) The only deficiency is a clearance from another post.

96.    DOS Foreign Affairs Manual emphasizes that: "There is no such thing as an informal refusal or a pending case once a formal application has been made.  9 FAM 504.11-2(b).

97.    "If a formal application as described in 9 FAM 504.1-3 has not been made and executed -- meaning, the applicant has not paid the application fee, appeared in person, and submitted a completed Form DS-260 for adjudication by a consular officer, affirmed that the DS-

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 20

260 and statements made during the interview are true, and biometrically signed the application under oath -- you may not approve or refuse the case." *Id.*

98. Finally, 9 FAM 504.11-3(A)(1)(b) instructs that "INA 212(b) requires you to provide timely written notice that the applicant is ineligible" 9 FAM 504.11-3(A)(1)(b)

99. Additionally, the FAM requires that "[t]he written notification should provide the applicant (and the attorney of record)" with the following:

(1) (U) The provision(s) of law on which the refusal is based;
(2) (U) The factual basis for the refusal (unless such information is classified);
(3) (U) Any missing documents or other evidence required;
(4) (U) What procedural steps must be taken by you or the Department; and
(5) (U) Any relief available to overcome the refusal.

9 FAM 504.11-3(A)(1)(b)

**<u>Non-Immigrant Visa Denial Pursuant to 8 U.S.C. § 1184(b) (INA 214(b))</u>**

100. Pursuant to 8 U.S.C. § 1184(b) (INA 214(b)): "[e]very alien shall be presumed to be an immigrant until he establishes to the satisfaction of the consular officer, at the time of application for a visa, and the immigration officers, at the time of application for admission, that he is entitled to a nonimmigrant status under section 1101(a)(15) of this title."

101. The FAM enforces § 1184(b) (INA 214(b)) directing consular officers to apply the following criteria to refuse visas under § 1184(b) (INA 214(b)): "[i]n determining whether visa applicants are entitled to temporary visitor classification [B-2], ***you must assess whether applicant***s (a) Have a residence in a foreign country, which they do not intend to abandon; (b) Intend to enter the United States for a period of specifically limited duration; and (c) Seek admission for the sole purpose of engaging in legitimate activities relating to business or pleasure." 9 FAM 402.2-2(B)(2).

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 21

102.    "If an applicant for a B-1/B-2 visa fails to meet one or more of the above criteria, you must refuse the applicant under **section 214(b) of the INA**."  9 FAM 402.2-2(B)(2).

103.    Thus, a visa application refused or denied pursuant to § 1184(b) (INA 214(b)) is based on finding that the applicant did not establish that they had "a residence in a foreign country, which they do not intend to abandon;" or that they "intend[ed] to enter the United States for a period of specifically limited duration;" or that that they "[sought] admission for the sole purpose of engaging in legitimate activities relating to business or pleasure." *See*, 9 FAM 402.2-2(B)(2); § 1184(b) (INA 214(b).

**Inadmissibility and Visa Ineligibility under 1182(a)(6)(C)(i) for All Non-Yemeni Visa Applicants**

104.    The INA provides that "[a]ny alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this chapter is inadmissible." 8 U.S.C. § 1182(a)(6)(C)(i).

105.    "A misrepresentation is only "willful" if it "involves conscious wrong or evil purpose ... or at least inexcusable carelessness," and is an even "stronger" requirement than 'voluntary or intentional.' *Ampe v. Johnson*, 157 F. Supp. 3d 1, 11 (D.D.C. 2016)(citing, *Willful*, Black's Law Dictionary (10th ed. 2014); *Am. Surety Co. of N.Y. v. Sullivan* , 7 F.2d 605, 606 (2nd Cir.1925) (L. Hand, J.) ("[T]he word 'willful' ... means no more than that the person charged with the duty knows what he is doing.")).

106.    "Thus, 'willful misrepresentation' requires, at the very least, knowledge of the falsity of the representation, much like fraud." *Ampe v. Johnson*, 157 F. Supp. 3d 1, 11 (D.D.C. 2016)

107. "A person cannot consciously misrepresent something if she does not even know she is making a misrepresentation." *Ampe v. Johnson*, 157 F. Supp. 3d 1, 11 (D.D.C. 2016)

108. Under 8 USC § 1182(a)(6)(C)(i), the "materiality of the misrepresentations is established where the government shows that disclosure of the concealed information probably would have led to the discovery of facts warranting the denial of a visa." *Marko v. Barr,* No. 18-11089, 2019 WL 5578103, at *5 (E.D. Mich. Oct. 29, 2019) (citing *Petkiewytsch v. INS*, 945 F.2d 871, 881 (6th Cir. 1991)). *See also*, *Matter of S– and B–C–* , 9 I. & N. Dec. 436, 447 (A.G.1961) ("A misrepresentation made in connection with an application for visa or other documents, or with entry into the United States, is material if either (1) the alien is excludable on the true facts, or (2) the misrepresentation tends to shut off a line of inquiry which is relevant to the alien's eligibility and which might well have resulted in a proper determination that he be excluded."); *see also*, *Mwongera v. United States*, 187 F.3d 323, 330 (3d Cir. 1999) (*quoting Matter of Kai Hing Hui*, 151 I. & N. Dec. 288, 289 (BIA 1975)).

109. However, to make finding of materiality "[t]he government must 'produce evidence sufficient to raise a fair inference ***that a statutory disqualifying fact actually existed*.'" *Forbes v. I.N.S.*, 48 F.3d 439, 443 (9th Cir. 1995) (citing *Kungys v. United States,* 485 U.S. 759, 783, (1988); *see also*, *United States v. Puerta,* 982 F.2d 1297, 1303-04 (9th Cir. 1992).

110. Pursuant to the "Attorney General's interpretation of "material,'" as set forth in *Matter of S– and B–C–*, "a misrepresentation only satisfies the test if there is some reasonable possibility that the applicant would have been denied admissibility." *Ampe v. Johnson*, 157 F. Supp. 3d 1, 18 (D.D.C. 2016) (citing *S– and B–C–* , 9 I. & N. Dec. at 447).

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 23

111.    "As the Attorney General explained in *Matter of S– and B–C–*, the test asks, "[I]f a relevant line of inquiry has been cut off, might that inquiry have resulted in a proper determination that the alien be excluded?" *Id.* (citing *S– and B–C–* , 9 I. & N. Dec. at 449).

112.    "If the answer to this question is "no," then the misrepresentation is immaterial." *Id.*

113.    In fact, "[i]n the Attorney General's own words: '[W]here the government officials have made an adequate investigation after the misrepresentation became known, or have had reasonable opportunity to do so, ___an unrefuted showing of eligibility by the alien may be highly persuasive that the misrepresentation was not material___.'" *Id* .

114.    As DOS recognizes, "*An applicant will never be ineligible under INA 212(a)(6)(C)(i) if he or she can demonstrate eligibility on the true facts....* [I]f the true facts support a finding that the alien is eligible for a visa, the misrepresented fact is not material." 9 FAM 302.9-4(B)(5)(c)(6).

115.    "False biographical data, standing alone, does not rise to the level of material misrepresentation." *Marko v. Barr,* No. 18-11089, 2019 WL 5578103, at *15 (E.D. Mich. Oct. 29, 2019).

116.    The "facts rising to the level of materiality tend to be much more significant than such superficial data" and generally require misrepresentations pertaining to eligibility for a visa. *Id. (citing, Bazzi*, 746 F.3d at 641-42 (Petitioner willfully misrepresented material facts where he engaged in a sham divorce in order to be eligible for a visa for an unmarried child); *Parlak*, 578 F.3d at 461-62 (Petitioner willfully misrepresented a material fact where he concealed his prosecution for engaging in terrorist activity); *United States v. Ahmed*, No. 12-951, 2017 WL 6508570 *1-4 (S.D. Ohio Sept. 20, 2017) (Defendant willfully

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 24

misrepresented material facts where he concealed trips that disrupted the statutory continuous residency requirement); *Kalymon*, 2007 WL 1012983 at \*4-8 (Defendant willfully misrepresented material facts where he lied about his war-time membership in a paramilitary group allied with the Nazis).”

117.    For example, in *Forbes v. I.N.S.*, 48 F.3d 439, 440-42 (9th Cir. 1994) the Ninth Circuit found that a visa applicant who failed to disclose a prior arrest even though he had been arrested on a charge that was later dismissed, did not commit material fraud or willful misrepresentation because the information would not have been a basis for denying his visa. *Id.*

118.    Similarly in *Ampe v. Johnson*, 157 F.Supp.3d 1, 5-6 (D.D.C. 2016) (Petitioner did not willfully misrepresent material facts where she omitted her children from a marriage with her second husband from a status adjustment form, even though her status was predicated on her marriage to her first husband.)

119.    The DOS Foreign Affairs Manual “FAM” confirms the agency’s adherence to this rule:

A misrepresentation made in connection with an application for a visa or other documents, or with admission to the United States, is material if either: **(1)** [t]he alien is ineligible on the true facts; or **(2)** ‘[T]he misrepresentation tends to shut off a line of inquiry which is relevant to the alien’s eligibility and which might well have resulted in a proper determination that he or she be inadmissible.”’ (*Matter of S- and B-C*, 9 I. & N. Dec. 436, at 447.)  This is also often referred to as “The Rule of Probability.”

9 FAM 302.9-4(B)(5)(a)(1)-(2).

120.    The FAM further provides that: “Materiality *is determined in the context of the individual case as to whether the misrepresentation was of direct and objective significance to the proper resolution of the individual's application for a visa*, admission to the United States, or other immigration benefit.” 9 FAM 302.9-4(B)(5)(a)(3).

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 25

121.    Specifically, the FAM recognizes and applies: "The Board of Immigration Appeals has held that misrepresentations of residence and identity are not automatically material and must be considered as any other misrepresentation." 9 FAM 302.9-4(B)(5)(C)(4)(a)(i).

122.    The FAM further state: "That means they [misrepresentations] can be material for purposes of 212(a)(6)(C)(i) if the individual is ineligible on the true facts, or the misrepresentation tends to *cut off a relevant line of inquiry which might have led to a proper finding of ineligibility*." 9 FAM 302.9-4(B)(5)(C)(4)(a)(i).

123.    Finally, the FAM provides that "[i]f an alien was found ineligible for a visa under a different and unrelated ground of ineligibility (*for example under INA 214(b)*) a *subsequent discovery* that the alien *had misrepresented certain aspects of the case* w*ould not be considered material* since the misrepresented facts did not tend to lead you into making an erroneous conclusion." 9 FAM 302.9-4(B)(5)(c)(2)(a).

124.    Nonetheless, in spite of a well-established and long-standing case law governing the material wilful misrepresentation and/or fraud, Defendants have adopted a separate standard for inadmissibility/ineligibility under 8 U.S.C. § 1182(a)(6)(C)(i) that is applied to visa applicants of Yemeni race, ethnicity, and/or national origin.

### History of Discriminatory Treatment of Yemeni-American Immigration Petitions and Applications

125.    Defendants' conduct here is symptomatic of its pattern and practice of systematically delaying adjudication and denying applications for immigration benefits filed by United States citizens and LPRs of Yemeni race and/or national origin and their beneficiary family members whom they are sponsoring under the family reunification policy of the INA.

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 26

126.     Defendants' have in the past lamented Congress's steadfast commitment to the INA's family reunification policy, Former USCIS senior official stated that:

> We start all these discussions with the assumption of the law not changing, which is a sad place to start a discussion. I mean, the right way to decide policy is for Congress and the president to decide policy. That's the way the government was set up.

*See*, "How The Trump Administration Uses 'Workarounds' To Reshape Legal Immigration" available at, https://www.npr.org/transcripts/769009449 (last accessed August 20, 2023).

127.     Cuccinelli continued that "We talk about what amount to workarounds to that [the law set by Congress.]" Paradoxically suggesting that "workarounds" the law still must "Of course" "have to be within the boundaries of the law[;]" which logically can't not be true. *Id.*

128.     One of Defendants' "work arounds" to the laws established by Congress is the systematic targeting of United States citizens of Yemeni race and/or nationality for the purpose of restricting and preventing the sponsorship of their foreign-born children as beneficiaries of of the INA's family unification policies as well as extinguishing the transfer of citizenship to their children through "birthright" as provided for by INA's policies based on *jus sanguinis*

129.     Such policies transcend presidential administrations and have been in effect since at least since the 1990s.

130.     One of the purposes of the targeting and systemically delaying the adjudication of immigration benefits is to delay the adjudication of immigration benefits for the children of Yemeni-American citizens until the child has "aged out" of eligibility for family-unification immigration benefits.

131.     Defendants' policy also has the collateral effect of preventing Yemeni-American citizens from being able to live with and raise their children here in the United States, and preventing their children from joining our national community and receiving the benefits of their

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 27

citizenship to the United States by birthright including the right to public education; attending school here in the United States where they will have the opportunity afforded to all to excel as far their own hard work, determination, and desire will allow them; opportunities not available in a failed state in the midst of a protracted and seemingly endless civil war, such as Yemen.

132.   "Schools are, after all, a formal societal institution that has an enormously expansive, almost universal reach in the early life course because they provide access to institutional resources and serve as sites for socialization and developing social relationships." Pivovarova, M., Powers, J.M. "Generational status, immigrant concentration and academic achievement: comparing first and second-generation immigrants with third-plus generation students." *Large-scale Assess Educ* 7, 7 (2019); *see also*, Suárez-Orozco, C., Suárez-Orozco, M. M., & Todorova, I. (2009). *Learning a new land: Immigrant students in American society*. Cambridge: Harvard University Press.

133.   "Students' experiences in high schools are particularly important to understand because high schools are the gateway to participation in postsecondary educational opportunities and US economic and political life." Pivovarova and Powers at 2.; *see also*, "integration [i]s the process by which members of immigrant groups and host societies come to resemble one another. That process, which has both economic and sociocultural dimensions, begins with the immigrant generation and continues through the second generation and beyond. The process of integration depends upon the participation of immigrants and their descendants in major social institutions such as schools and the labor market, as well as their social acceptance by other Americans. Greater integration implies movement toward parity of critical life opportunities with the native-born American majority. Integration may make immigrants and their children better off and in a better position to fully contribute to their communities, which is no doubt a major objective for the immigrants themselves. If immigrants come to the United States with very little education and

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 28

become more like native-born Americans by getting more education, they are considered more integrated. They are also considered better off, because more education improves their well-being."). National Academies of Sciences, Engineering, and Medicine. 2015. *The Integration of Immigrants into American Society*, at 2. Washington, DC: The National Academies Press. https://doi.org/10.17226/21746.

134. Through such policies Defendants are attempting to stifle the generational immigration of the families of United States citizens in a frequency, intensity, and manner that is simply not seen of United States citizens of other races and/or national origins.

135. The Defendants' have attempted to achieve this objective through the adopted of various formal and informal adjudicatory and investigative policies and procedures which create an implement separate and distinct adjudication procedures for Yemeni-Americans designed to to deter, delay, stymie and otherwise prevent Yemeni-Americans from sponsoring their children for immigrant visa applications under the INA's family unification policy and/or transiting citizenship to their children under the INA's *jus sanguinis* provisions and to deter and prevent Yemeni immigration to the United States.

136. Even where Defendants fail to completely the prevent Yemeni immigration to the United States, their targeting of the children of United States citizens of Yemeni race and/or national origin, prevents children from immigrating to the United States during their young formative years, being educated in the United States, and fulfilling the generational progress that is part of the "American Dream" experienced and fulfilled by countless of countries citizens and children of immigrants.

137. Further, by preventing the immigration of Yemeni children to the United States, Defendants' practice and procedure, forces the children of United States citizens of Yemeni

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 29

race and/or national origin to spend their formative years in Yemen, which is in a repeated and prolonged state of civil war, and without any real opportunity for education, where people marry at a much younger age.

138.    For example, once married, the children of United States citizens no longer are considered "immediate relatives" under the INA and rather must wait for a visa priority date to become current.

139.    In furtherance of the objective to reduce, delay, stymie, and prevent Yemeni-American citizens from building lasting generational permanency in the fabric of our society and acquiring the status and political and social power and influence attendant to such generational status immigration to the United States Defendants have undertaken to establish a byzantine administrative procedural labyrinth designed to repeatedly delay, stymy, and prevent the lawful immigration to the United States of the family members of Yemeni-American United States citizens and LPRs.

140.    On information and belief, such practices and policies have existed for past two decades and have included the unlawful seizure and confiscation of the passports and citizenship documents of United States citizens' of Yemeni race and/or national origin at the now-closed United States Embassy in Sana'a; Department of State, Office of Inspector General (DOS-OIG), *Review of Allegations of Improper Passport Seizures at Embassy in Sana'a, Yemen*, OIG-ESP-19-01 (October 2018), available at:  https://www.stateoig.gov/system/files/esp-19-01_0.pdf (hereinafter "DOS-OIG Report").

141.    Pursuant to the same practices at procedures involved in the confiscation and passports and citizenship records and evidence at the Sana'a Embassy, Defendants also obtained coerced and/or non-consensual statements used to denaturalize Yemeni-Americans or deny immigration applications of other Yemeni-Americans seeking to sponsor their family members. *See*,

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 30

*Alzokari v. Pompeo,* 973 F.3d 65, 71, 72 n.11 (2d Cir. 2020) (noting that purported confessions obtained by the Sana'a Embassy staff in the course of fraud investigations into claimed relationships for the purposes of obtaining immigration benefits were obtained under "dubious circumstances" and noting the numerous claims of unlawful coercion made against Sana'a Embassy officials in similar circumstances.).

142.    The Second Circuit additionally "note[d] that Special Agent Howell has obtained strikingly similar statements to the one at issue here during his tenure at the United States embassy in Sana'a, Yemen. *See, e.g., Omar v. Kerry*("*Omar I*"), No. 15-cv-01760, 2016 WL 617449 (N.D. Cal. Feb. 16, 2016); *Omar v. Tillerson* ("*Omar II*"), No. 15-cv-01760, 2017 WL 5751314 (N.D. Cal. Nov. 28, 2017). In *Omar,* plaintiff Mosed Shaye Omar was born in Yemen in 1951, immigrated to the United States in 1972, and became a United States naturalized citizen in 1978. *Omar I,* 2016 WL 617449, at *1. In 2012, Omar traveled to Yemen to obtain a U.S. passport for his daughter. *Id.* After attending an interview at the United States embassy in Sana'a, Omar remained in Yemen for several months, waiting to hear from the embassy regarding his daughter's application. *Id.* Just before he was to return to the United States, Omar visited the embassy at the request of embassy officials, who took his passport on arrival. *Id.* Special Agent Howell interviewed Omar in an interrogation room for several hours, and Omar eventually signed a statement similar to the one Alzokari signed. *Id.* at *2. For example, the statement Omar signed claimed that Omar was an "assumed/fraudulent name" that Omar used when he naturalized, that he was "smuggled to the US by a distant `uncle,'" and that he smuggled others into the United States by falsely claiming they were his children. *See* Voluntary Statement, *Omar I,* No. 15-cv-1760 (N.D. Cal. June 24, 2015), ECF No. 14-5. Because of the statement, the Department revoked Omar's passport, claiming that he applied for it under a false name. *Omar I,* 2016 WL 617449, at *2. The district court reversed that revocation as arbitrary and

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 31

capricious and enjoined the Department "from revoking or denying Mr. Omar's passport on this same basis." *Omar II,* 2017 WL 5751314, at \*7. However, the district court later vacated its judgment on the stipulation of the parties, who agreed in mediation in the Ninth Circuit to settle the action if the Department issued a new passport to Omar and the district court vacated its judgment. *Omar v. Pompeo* ("*Omar III*"), No. 15-cv-1760, 2018 WL 4191416 (N.D. Cal. Aug. 16, 2018); Joint Mot. To Vacate J., *Omar I,* No. 15-cv-1760 (N.D. Cal. Aug. 13, 2018), ECF No. 105." *Alzokari* , 973 F. 3d 65 n.6; see also,  *see also*, *Ali v. Pompeo*, No. 16-CV-3691-SJB, 2020 WL 2312626, at \*9 (E.D.N.Y. Apr. 30, 2020), *enforcement granted,* No. 16-CV-3691-SJB, 2020 WL 6435834 (E.D.N.Y. Nov. 2, 2020) ("Counsel for Defendants also acknowledged that there were errors in the translated November 2013 statement. For example, on the morning of the hearing counsel for the Department submitted a new translation of Ali's statement. The original translation begins '[M]y true name is Ahmen Hisam Nagi FADEL. My true father is Hizam Nagi Nagi FADEL.' According to the State Department's counsel, Fadel's name was included erroneously, 'possibly based on a previous confession,' of another person."); *see also*." *Ali v. Pompeo*, No. 16-CV-3691-SJB, 2020 WL 6435834, at \*7 (E.D.N.Y. Nov. 2, 2020) ("Omar's experience at the Sana'a embassy mimics Ali's and is recounted in Dave Eggers, *The Monk of Mokha*, at 217–20 (2018)).

143.    Defendants have also participated in the adoption of specific procedures governing adjudication of I-130 petitions filed by Yemeni-Americans, which was based on speculative or deliberately misleading data and based on racist stereotypes that Defendants  themselves were aware did not contribute to fair or efficient adjudication of Yemeni I-130 petitions (USCIS Policy Memorandum (PM-602-0064), *Supplemental Guidance for Adjudicating Family-Based Petitions Supported by Relationship Documents Actually or Purportedly Issued by a civil Authority in Yemen; Revision to the Adjudicator's Field Manual (AFM) Chapter*

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 32

*21*); relocating Yemeni immigration benefits to other agencies and sub-agencies for use in investigations unrelated to the adjudication of the specific immigration benefit; the creation and continued implementation of the "fraudulent until proven otherwise" standard; the use of interagency investigation to produce unreliable "fraud indicators" to justify further investigations to produce more unreliable "fraud indicators."

144.    Even after the withdrawal of such obviously discriminatory policies in the face of legal challenges, Defendants have developed and contributed to a policy which declares all Yemeni official records unreliable *per se. See*, *USCIS Policy Manual, Volume 1 Part E Chapter 6*; Department of State, *Visa Reciprocity Schedule By Country - Yemen*

145.    The effect of Defendants policy is that any and all Yemeni-Americans seeking to sponsor their overseas family members are not afforded the same non-discretionary adjudication for their petitions, because they are "presumptively ineligible" due to the failure to submit primary evidence of their familial relationships because those records have been declared unreliable per se by Defendants. See, *USCIS Policy Manual, Volume 1 Part E Chapter 6*; Department of State, *Visa Reciprocity Schedule By Country - Yemen*; 8 C.F.R. § 204.1(f)(1); 8 CFR 103.2(b)(2)(i); 8 CFR § 204.2(a)(2); 8 CFR § 204.2(d)(2);

146.    The purpose of Defendants separate and distinct adjudication procedures is to deter, delay, stymie and otherwise prevent Yemeni immigration to the United States by raising the standard necessary for approval of visa applications filed by Yemeni nationals beyond the standards applied to all other nationalities.

**Development of "Extreme Vetting" Policy and the "Fraudulent Until Proven Otherwise" Standard and the  Applied to Yemeni Visa Applicants**

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 33

147.    Defendants have created a separate standard for inadmissibility and visa ineligibility under 8 U.S.C. § 1182(a)(6)(C)(i) applied to Yemeni visa applicants than the standard applied to all other visa applicants.

148.    This heightened process has been termed "Extreme Vetting."

149.    The "extreme vetting" of Yemeni visa applicants has been developed from the now-closed United States Embassy in Sana'a development of the "fraudulent until proven otherwise" standard applied to visa applicants at the Sana'a Embassy.

150.    On September 28, 2009, the United State Embassy in Sana'a issued State Department Cable 09 SANAA 1729 in which the Embassy articulated the standard to be applied to visa applications made by individuals of Yemeni race, ethnicity, and/or national origin – announcing that such visa applications would be considered "fraudulent until proven otherwise." *See*, DOS Cable (09 SANAA 1729).

151.    On or about November 16, 2009 the Sana'a Consular Chief at the time Kim Shaw explained in an Email to USCIS official Joseph Duquette that the Sana'a Embassy was seeking a legal avenue to deny otherwise approval visa applicants where the Embassy suspected that the applicant was really a biological child of the visa petitioner and not a step-child.

152.    However, under the INA both "stepchildren" and "biological children" are treated the same: they are both included under the definition of "child" and afforded the same exact visa category based on the other factors such as age, marriage status, and the citizenship of their parent in the United States who petitioned for them. *See,* 8 U.S.C. §1101(b)(1) (definition of "child").

153.    What Defendants were seeking to accomplish was to create a visa denial category for non-material misrepresentations such as misrepresentation as to whether a child was

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 34

a "biological child" or "stepchild" as a means of simply refusing to issue visas to Yemeni visa applicants.

154.    Specifically, Ms. Shaw implored USCIS to increase the DNA testing to cause the denial of visa petitions (Form I-130) by USCIS and reduce the number of overall visa applications:

> *I am liking the idea of required testing resulting in abandoned cases that never get to us*. *We'd love to just not get cases here*. I would call your attention to the attached fraud cable we recently completed. *Our step-children problem is growing and of great concern to us here*. Given the information we have, we'd love to see you require DNA testing even on claimed 'step-child' cases -- *basically all Yemeni cases*. We think you'd see many of them fail to comply with the DNA requirement, as well*, since the 'step-kids' are really biological kids*.

155.    In actuality, there was no "step-children problem" as both "biological children" and "step-children" are children under the INA and treated exactly the same for visa application and adjudication purposes.

156.    All "biological children" whose parents were married at any point from the time of their birth until their 18th birthday necessarily fall within the INA's definition of "stepchild" as the definition of stepchild relationship is one where an individual marries the birthparent before the child's 18th birthday.

157.    "The term 'child' means an unmarried person under twenty-one years of age who is … a stepchild, whether or not born out of wedlock, provided the child had not reached the age of eighteen years at the time the marriage creating the status of stepchild occurred." 8 U.S.C. §1101(b)(1)(B).

158.    Thus, there is no material distinction between a "biological child" or a "stepchild." The only difference between the two is the type of evidence necessary to prove the

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 35

relationship, which requires the petitioning parent to have married the birth parents before the child's eighteenth birthday. See, 8 U.S.C. §1101(b)(1)(B).

159.    However, in 2009 Defendants' determined that all Yemeni step-children were really biological children and for this reason all Yemeni visa application would be considered "fraudulent until proven otherwise."

160.    In doing so, Defendants created a separate and distinct standard for inadmissibility under 8 U.S.C. § 1182(a)(6)(C)(i) for "fraud or willful misrepresentation of a material fact" by including a misrepresentation regardless of whether it was willful, material, or even a misrepresentation.

161.    Pursuant to Defendants "extreme vetting" protocols and procedures, Defendants have artificially raised the standard for  "fraud or willfully misrepresenting a material fact."

162.    The extreme vetting standards have been developed for decades and are designed to impose the "fraudulent to proven otherwise" standard developed by Department of State officials that former United States Embassy in Sana'a.

163.    Those standards deliberately sought to enforce the "material" "fraud and willful misrepresentation" inadmissibility standard more stringently against Yemeni visa applicants than against all other visa applicants; including applying the "material" "fraud and willful misrepresentation" to range of conduct that is either not "material" "fraud" or "willful misrepresentation."

164.    As part of the "extreme vetting" standards applied to Yemeni applicants, Defendants have developed and implemented Form DS-5355, which was adopted as the mechanism for the "extreme vetting" practices of the Trump Administration, prior to

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 36

Defendants ultimately banning Yemeni-American families from entering the United States by Executive Order and suspending visa processing pursuant to the entry bans.

165.    "As part of a policy implementing "extreme vetting" of visa applicants in order to tighten immigration controls, the Trump administration approved a new questionnaire (Form DS-5535, Supplemental Questions for Visa Applicants) that requires applicants to provide biographical information going back 15 years and social media information for the past 5 years." *See*, *Trump Begins "Extreme" Visa Vetting, New Questionnaire Requests 15 Years of Information and Social Media Info* (available at https://ogletree.com/insights/trump-begins-extreme-visa-vetting-new-questionnaire-requests-15-years-of-information-and-social-media-info/).

166.    Form DS-5535, approved on May 23, 2017, arose "in the context of *__a directive dated March 6, 2017, ordering the U.S. Department of State to enhance screening procedures__*, *__and a diplomatic cable dated March 17, 2017, that ordered U.S. consulates to develop additional criteria to identify "applicant populations warranting increased scrutiny.__*" *Id.*

167.    The discriminatory nature of the "extreme vetting" procedures is not an issue for debate as President Biden's "*Proclamation on Ending Discriminatory Bans on Entry to The United States*" specifically ordered review of "current screening and vetting procedures for those seeking immigrant and nonimmigrant entry to the United States" which "should include information about any procedures put in place as a result of any of the Executive Order and Proclamations revoked in section 1 of this proclamation" (the "discriminatory bans" Executive Order 13780, and Proclamations 9645, 9723, and 9983)  and "*__should also include an evaluation of the usefulness of form DS-5535__*." *Proclamation on Ending Discriminatory Bans on Entry to The United States*. *The White House*. January 20, 2021 (last accessed August 20, 2023).

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 37

168.    The "*Proclamation on Ending Discriminatory Bans on Entry to The United States*" was signed on President Biden's first day in office and was the second executive action taken by President Biden after issuance of *Executive Order On Advancing Racial Equity and Support for Underserved Communities Through the Federal Government*, which stated that:

> Equal opportunity is the bedrock of American democracy, and our diversity is one of our country's greatest strengths. But for too many, the American Dream remains out of reach. Entrenched disparities in our laws and public policies, and in our public and private institutions, have often denied that equal opportunity to individuals and communities.

169.    President Biden's Executive Order continued:

> *It is therefore the policy of my Administration that the Federal Government should pursue a comprehensive approach to advancing equity for al*l, including people of color and others who have been historically underserved, marginalized, and adversely affected by persistent poverty and inequality. *Affirmatively advancing equity, civil rights, racial justice, and equal opportunity is the responsibility of the whole of our Government*. Because advancing equity requires a systematic approach to embedding fairness in decision-making processes, *executive departments and agencies (agencies) must recognize and work to redress inequities in their policies and programs that serve as barriers to equal opportunity."*
>
> ….
>
> Consistent with these aims, each agency must assess whether, and to what extent, its programs and policies perpetuate systemic barriers to opportunities and benefits for people of color and other underserved groups. Such assessments will better equip *agencies to develop policies and programs that deliver resources and benefits equitably to all.*

170.    Similarly, President Biden's second official action as President on January 21, 2021 was to issue the *Proclamation on Ending Discriminatory Bans on Entry to The United States*, which stated that:

> The United States was built on a foundation of religious freedom and tolerance, a principle enshrined in the United States Constitution. Nevertheless, the previous

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 38

administration enacted a number of Executive Orders and Presidential Proclamations that prevented certain individuals from entering the United States — *first from primarily Muslim countries, and later, from largely African countries. Those actions are a stain on our national conscience and are inconsistent with our long history* of welcoming people of all faiths and no faith at all.

"*Beyond contravening our values, these Executive Orders and Proclamations* have undermined our national security. They have jeopardized our global network of alliances and partnerships and *are a moral blight* that has dulled the power of our example the world over. *And they have separated loved ones, inflicting pain that will ripple for years to come. They are just plain wrong.*"

And when visa applicants request entry to the United States, we will apply a rigorous, individualized vetting system. *But we will not turn our backs on our values with discriminatory bans on entry* into the United States

171.    Taken together President Biden's first two executive actions upon assuming the office of the President established the that public policy of the United States as not only opposing the discriminatory denial of visa applications due to race, national origin and religion, but further stating that such discriminatory policies violate the core values of the United States as enshrined in the Constitution.

172.    Furthermore, President Biden's actions have recalibrated the statement of Executive public policy to align the policy with the actual public policy adopted by Congress through the Immigration and Nationality Act.

173.    Nonetheless, the Department of State still continues to discriminate against individuals based on race, religion and/or national origin and still uses Form DS-5535 as a means of delaying and attempting to create procedural default on visa applications in order to manufacture visa denials where no legal grounds exist, such as the case with the Plaintiffs here.

174.    Nonetheless, in spite of President Biden's explicit orders and instructions to end the "Extreme Vetting" practices, Defendants continue to discriminate against Yemeni visa

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 39

applicants through the application of a more rigorous and heightened application of the legal and factual requirements applied to Yemeni visa applicants as compared to all other visa applicants.

## The Doctrine of Consular Nonreviewability

175.    The doctrine of consular nonreviewability is either inapplicable in this matter or has several exceptions, which are applicable here.

176.    "The doctrine of consular nonreviewability is a rule of decision, formulated by courts … that curtails judicial review of procedural due process challenges to visa denials." *Muñoz v. U.S. Dep't of State*, 50 F.4th 906, 920-21 (9th Cir. 2022).

177.    Pursuant to the judge-made doctrine, "[i]nstead of evaluating whether the procedures attendant on the deprivation of a [party's] liberty interest were 'constitutionally sufficient'—which we do in other contexts by carefully balancing the private interests, the risk of an erroneous deprivation, and the governmental interests at stake"; courts forgo "this balancing test if the government proffers 'a facially legitimate and bona fide reason' for denying the visa." *Muñoz v. U.S. Dep't of State*, 50 F.4th 906, 921 (9th Cir. 2022) (citation omitted).

178.    However, even though Consular nonreviewability "establish[es] that the substance of the notice is constitutionally adequate when the government produces 'a facially legitimate and bona fide reason' for the visa denial, these decisions do not foreclose application of other core due-process requirements" such a timeliness. *Muñoz v. U.S. Dep't of State*, 50 F.4th 906, 921 (9th Cir. 2022)(citing, *Din* , 576 U.S. at 106, 135 S.Ct. 2128(Kennedy, J., concurring in the judgment); *Goldberg v. Kelly* , 397 U.S. 254, 267, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) ("holding that 'timely and adequate notice' holding that "timely and adequate notice" of the

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 40

reasons underlying the deprivation of a right guaranteed by the Due Process Clause is a key requirement of due process").

179.    The doctrine of consular nonreviewability has origins in a time when anti-immigration sentiments ran high. This is particularly troublesome due to the fact that consular officers sometimes rely on racial and economic stereotyping when they deny visas and some consular officers have been found to have used openly racist criteria in rendering visa decisions. *See, Olsen v. Albright*, 990 F. Supp. 31 (D.D.C. 1997). *Olsen* involves a consular officer stationed in Brazil who sued the State Department because he was fired for refusing to follow the consulate's racial visa eligibility policies. The manual the consular officer refused to follow established fraud profiles which were based on factors such as race and national origin. The manual instructed consular officers to scrutinize Korean and Chinese applicants for fraud and declared anyone from certain predominantly black cities were "suspect unless older, well-traveled, etc." The consular section head had further stated that "Filipinos and Nigerians have high fraud rates, and their applications should be viewed with extreme suspicion, while British and Japanese citizens rarely overstay, and generally require less scrutiny." *Id.*

180.    The doctrine of consular nonreviewability has been heavily criticized for the almost absolute power it affords consular officers over visa issuance.   In fact, it has long been held that the doctrine of consular nonreviewability is not absolute. *Kleindienst v. Mandel,* 408 U.S. 753 (1972).

181.    First,  as to Plaintiff's claims which seek to compel the completion of visa applications where no final decision was entered and/or the visas are subject to "Administrative Processing", the doctrine of consular nonreviewability does not apply. *See Nine Iraqi Allies v. Kerry,* 168 F.Supp. 3d 268 (D.D.C. 2016); *citing Patel v. Reno,* 134 F.3d 929, 932 (9ᵗʰ Cir. 1997*);*

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 41

*see also Ibrahim v. United States Dep't of State,* No. 19-610, 2020 WL 1703892, p. 15 (D.D.C. April 8, 2020); *Chavis v. United States Dep't of State,* No. 22-796, 2023 WL 3098411 (M.D. Fl. Jan. 4, 2023); *Assad v. Holder*, 13-117, 2013 WL 5935631 (D.N.J. Nov. 1, 2013).

182.    An additional exception to the doctrine of consular nonreviewability is when the suit challenges the authority of the consul to take or fail to take an action as opposed to a decision taken within the consul's discretion, *See Patel v. Reno*, 134 F.3d 929, 934, *citing Mulligan v. Schultz*, 848 F.2d 655, 657 (5th Cir. 1988) (judicial review is appropriate to consider a challenge to the Secretary's authority to place temporal limits on processing non-preference visa applications).

183.    Another major exception to the doctrine of consular nonreviewability are situations where visa applicants are allowed to argue that a consular officer's decision was particularly arbitrary or contrary to law.  *See, e.g.*, *Raduga USA Corp. v. U.S. Dep't of State,* 440 F. Supp. 2d 1140, 1146 n.2 (S.D. Cal. 2005), *as amended* March 3, 2006 ("[T]here are exceptions to this general rule of non-reviewability.").

184.    "Where the denial of a visa affects the fundamental rights of a U.S. citizen, judicial review of the visa decision is permitted if the government fails to provide 'a facially legitimate and bona fide reason' for denying the visa, *id.*, or if—despite the government's proffer of a facially legitimate and bona fide reason—the petitioner makes an 'affirmative showing' that the denial was made in 'bad faith,'" *Muñoz v. U.S. Dep't of State*, 50 F.4th 906, 909 (9th Cir. 2022)(quoting *Kerry v. Din* , 576 U.S. 86, 105 (2015) (Kennedy, J., concurring in the judgment)).

185.    As the Supreme Court explained in *Kerry v. Din*, 135 S.Ct. 2128 (2015), courts may look behind the doctrine of consular nonreviewability as a result of the failure to cite

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 42

a facially legitimate inadmissibility or upon a "showing of bad faith on the part of the consular officer." *Id.* at 2141.

186.    Bad faith can be established where a visa applicant "allege[s] that the consular official did not in good faith believe the information he had." *Id*. at 7 (quoting *Bustamante v. Mukasey*, 531 F.3d 1059, 1062-63 (9th Cir. 2008); *see also*, *Yafai v. Pompeo*, 912 F.3d 1018 (7th Cir. 2019) (Barrett, J.)

187.    Further, the "facially valid and *bona fide*" test would not be met "if the consular official had concluded that the [evidence of ineligibility was] false, or if [the plaintiff] had presented strong evidence of innocence that the consular officer refused to consider." *Morfin v. Tillerson*, 851 F.3d 710, 713-14 (7th Cir. 2017).

188.    The "[Ninth] circuit has distilled the analytic framework articulated in *Din* for evaluating whether the *Mandel* exception to consular nonreviewability applies to a petitioner's claim into a three-step inquiry." *Muñoz v. U.S. Dep't of State*, 50 F.4th 906, 909 (9th Cir. 2022)

189.    At steps one and two, we consider whether the government carried its burden of providing a "facially legitimate and bona fide reason" for the visa denial." *Muñoz v. U.S. Dep't of State*, 50 F.4th 906, 909 (9th Cir. 2022)

190.    "First, we examine whether the consular officer denied the visa "under a valid statute of inadmissibility." " *Muñoz v. U.S. Dep't of State*, 50 F.4th 906, 909 (9th Cir. 2022).

191.    "Second, we consider whether, in denying the visa, the consular officer "cite[d] an admissibility statute that specifies discrete factual predicates the consular officer must find to exist before denying a visa" or whether, alternatively, there is "a fact in the record that

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 43

provides at least a facial connection to the statutory ground of inadmissibility." *Muñoz v. U.S. Dep't of State*, 50 F.4th 906, 909 (9th Cir. 2022)

192.    "Only if [the court] conclude[s] that the government gave a facially legitimate and bona fide reason for denying the visa do[es] '[the court] proceed to the third step, which requires [the court] to determine whether the plaintiff has carried his or her 'burden of proving that the [stated] reason was not bona fide by making an affirmative showing of bad faith' by the consular officials involved in the visa denial." *Muñoz v. U.S. Dep't of State*, 50 F.4th 906, 909-10 (9th Cir. 2022).

**Plaintiffs' Attempts to Apply for Immigration Benefits**

193.    Mr. Alumari filed I-130 petitions for both siblings which were approved on or about November 27, 2006.

194.    In accordance, with the visa availability for siblings, their visa priority date did not become current until approximately 2019.

195.    Once their visa priority became current, on or about June 21, 2019 the National Visa Center ("NVC") created Case Numbers: DJI2019671018, invoice number 26146868 for the visa application for Yousef Ali Alumari, his wife and their child; and DJI2019671025, invoice number 26146867 for Noor Ali Alumari, her husband and their children. (Exhibits D, E).

196.    In 2004, Youseff Alumari and Noor Alumari applied for a B-2 visitor visa which was denied under 8 U.S.C. § 1184(b) (INA 214(b)) because he "could not, on the known facts, qualify as a non-immigrant."

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 44

197. At the time Youseff and his sister Noor were teenagers who wished to travel to the United States to visit their grandparents, as their grandmother was ill.

198. Since Youseff and Noor's parents had died earlier in their lives, their grandparents acted as the surrogate parents.

199. Unfortunately, Youseff and Noor were advised to claim that their grandparents were their actual parents, rather than their grandparents.

200. Nonetheless, even without the disclosure of this information, the siblings were denied B-2 visas in 2004 for failure to establish non-immigrant status pursuant to 8 U.S.C. § 1184(b) (INA 214(b)).

201. Years later beginning in 2019 Plaintiffs voluntarily disclosed the 2004 visa applications.

202. On August 6, 2019 the NVC and visa application fees were paid for both families.

203. On or about October 25, 2019, Forms DS-260s for Yousef, Noor and their family members were completed and the entire visa applications packages for both families were submitted to the NVC.

204. On February 6, 2020, the NVC informed Plaintiff by email that the NVC had approved all the submitted documents, but that Yousef and his family's case was pending the scheduling of a visa interview.

205. On July 25, 2021, a visa interview was conducted for Yousef Alumari, his wife and their child.

206. At the July 24, 2021 interview, the visas were refused placed in administrative processing as well as being refused under 1182(a)(6)(C)(i) because Youseff had

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 45

honestly disclosed that in the 2004 non-immigrant visa application he had claimed that his grandfather was actually his father and provided an incorrect date of birth.

207.    However, that information was not known at the time of the 2004 visa application and remained unknown until Yousef voluntarily disclosed the information in his 2019 immigrant visa application and 2021 visa interview.

208.    Since neither Youseff's age or his relationship to his father or his grandfather was relevant to Youseff's non-immigrant visa application, which was denied because Youseff "could not, on the known facts, qualify as a non-immigrant" pursuant to 8 U.S.C. § 1184(b) (INA 214(b)).

209.    As the DOS FAM reiterates: "If an applicant for a B-1/B-2 visa fails to meet one or more" of the following "criteria, you must refuse the applicant under **section 214(b) of the INA** … a) Have a residence in a foreign country, which they do not intend to abandon; (b) Intend to enter the United States for a period of specifically limited duration; and (c) Seek admission for the sole purpose of engaging in legitimate activities relating to business or pleasure." 9 FAM 402.2-2(B)(2).

210.    Youseff failed to satisfy the one of three requirements to show that he qualifies as a non-immigrant.

211.    Youseff's age or relationship to his father and his grandfather were entirely immaterial to this determination as such information did not relate to a ground of eligibility for the B2 visa and further did not cut off an inquiry that would have related to the ground of B2 eligibility.

212.    Even though Defendants are aware of the controlling legal principles as well as the facts relating to 2004 visa application, Defendants applied a different standard for §

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 46

1182(a)(6)(C)(i) based on Youseff status as a Yemeni: the "fraudulent until proven otherwise standard."

213.    The visa applications for Noor meanwhile remain pending; however, Noor and her family's visa applications will also be subjected to the same erroneous and discriminatory visa adjudication procedures which have caused the denial of Youseff's visa application.

214.    Recently on or about March 28, 2023, Noor's husband, Ebrahim Mohammed Obaid, a derivative applicant on Noor's application was murdered by Houthi rebels at a checkpoint near Sana'a Yemen. (Exhibit CC - Declaration of Mohamed Alumari)

215.    Noor and her two young children witnessed the murder of their father. *Id.*

216.    Since the rebels control Sana'a and the surrounding areas, the Alumaris are unable to lodge an official complaint and fear suffering retaliation if they were to even try to seek some sort of legal recourse for their murder of Ebrahim. *Id.*

217.    Yemen is in the midst of a protracted, bloody, and brutal civil war which has created a humanitarian crisis.

218.    The Aluamri's family's loss of their husband, father, and brother-in-law has been devastating. *Id.*

219.    Noor and her children have moved out of their home and live in complete fear for their own safety. *Id.*

## **INJURY TO PLAINTIFFS**

220.    Defendants' collective actions, practices, and policies have caused Plaintiffs immeasurable emotional anguish and financial hardship.

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 47

221.    Plaintiff Mohamed Alumari and his family in the United States support Youseff and his family and Noor and her family as they are unable to make a living in Yemen due to the civil war. (Exhibit M - Western Union Receipts)

222.    Plaintiffs are also separated from each other and now have lost a member of their family who was murdered by rebels in Yemen.

223.    As a United States citizen visa sponsor separated from his family, Plaintiff Mohamed Alumari has standing to challenge the visa adjudication and/or denial on behalf of his family members. *Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018)

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violation of INA's Nondiscrimination Clause (8 USC §1152(a).)
### (As to all Defendants)

224.    The allegations set forth in all preceding paragraphs are repeated and incorporated as if fully set forth herein.

225.    Pursuant to the INA's "Nondiscrimination" clause "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence." 8 USC §1152(a).

226.    The only exceptions to this clause are the restrictions explicitly adopted by Congress which are "specifically provided in paragraph (2) and in sections 1101(a)(27), 1151(b)(2)(A)(i), and 1153 of this title."

227.    Defendants have adopted "extreme vetting" procedures to apply to visa adjudication for all visa applicants of Yemeni race, ethnicity, and/or national origin.

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 48

228. The extreme vetting standards have been developed for decades and are designed to impose the "fraudulent to proven otherwise" standard developed by Department of State officials at the former United States Embassy in Sana'a.

229. As part of the extreme vetting process, Defendants have adopted additional procedures applied only on account of a visa applicant's race, ethnicity, and/or national origin.

230. For example, Defendants continue to utilize Form DS-5535, Supplemental Questions for Visa Applicants, which was designed and installed as a means of delaying and denying visa applications made by nationals of specific countries, including Yemen.

231. Similarly, Defendants have constructed and applied a different standard for "material" "fraud and willful misrepresentation" inadmissibility standard under sec 1182(a)(6)(C)(i) for Yemeni visa applicants.

232. Defendants have developed and applied a standard under 1182(a)(6)(C)(i) for Yemen visa applicants which deems "material" and "willful" a range of conduct that is either not "material" or "willful" "fraud" or "misrepresentation" under the controlling laws and policies applied to all other visa applicants.

233. As a result of the application of a separate standard for material misrepresentation and fraud applied to visa applicants of Yemeni race, ethnicity, and/or national origin, Youseff's visa application has been denied.

234. Plaintiffs visa applications have been subjected to Defendants separate adjudication criteria, standards, procedures, and analysis causing delay and denial in their visa applications.

235. As a result Plaintiffs have been harmed including suffering familial separation, emotional and financial loss from the discriminatory visa application process.

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 49

**SECOND CAUSE OF ACTION**
**Section 706(1) of the Administrative Procedure Act, 5 U.S.C. § 706(1)**
(**As against all Defendants**)

236.    The allegations set forth in all preceding paragraphs are repeated and incorporated as if fully set forth herein.

237.    The APA provides a waiver of sovereign immunity that allows a person to sue the federal government over unlawful agency action for non-monetary damages. 5 U.S.C. § 702. The sovereign immunity waiver found in the APA applies to suits that seek relief other than money damages, which generally includes suits for injunctive and declaratory relief. *See, e.g., Trudeau v. FTC*, 456 F.3d 178, 186 (D.C. Cir. 2006).

238.    Under the APA, a person who suffers a legal wrong because of agency action, or who is adversely affected by agency action within the meaning of a relevant statute, is entitled to judicial review. 5 U.S.C. § 702. "Agency action" is defined to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). Thus, an agency action may include the wrongful revocation of an approved visa application and subsequent failure to properly adjudicate a matter on remand.

239.    Section 706(1) of the APA authorizes a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). While a reviewing court can compel an agency to take action where it finds unreasonable delay, the court cannot determine the content of the determination or the conclusion the agency ultimately reaches. *See Norton*, 542 U.S. at 65. Nevertheless, the reviewing court may impose a deadline on the agency or, alternatively, to order the agency to act promptly. *See, e.g., Public Citizen Health Research Group v. Auchter*, 702 F.2d 1150, 1158–59 (D.C. Cir. 1983) (ordering agency to promulgate a notice of

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 50

proposed rulemaking within 30 days); *see Forest Guardians v. Babbitt*, 174 F.3d 1178, 1193 (10th Cir. 1998) (ordering agency to issue a final rule "as soon as possible").

240.    In the INA, Congress stated that:

It is the sense of Congress that the processing of an immigration benefit application should be completed not later than 180 days after the initial filing of the application, except that a petition for a nonimmigrant visa under section 1184(c) of this title should be processed not later than 30 days after the filing of the petition.

8 U.S.C. § 1571(b).

241.    By statute and regulation, the Department of State must either grant or deny all properly-filed visa applications. *See*, 8 U.S.C. § 1202(b) ("All immigrant visa applications ***shall be*** reviewed and ***adjudicated by a consular officer***"); 22 CFR § 42.81 ("When a visa application has been properly completed and executed before a consular officer in accordance with the provisions of the INA and the implementing regulations, the consular officer must issue the visa, refuse the visa under INA 212(a) or 221(g) or other applicable law or, pursuant to an outstanding order under INA 243(d), discontinue granting the visa.").

242.    Defendants have failed to issue a final visa decision for the visa applications filed on behalf of Noor Alumari and her family members.

243.    Such failure constitutes agency action unlawfully withheld, which this Court may compel under APA 706(1).

244.    Thus, under APA 706(1), this Court may order Defendants to process Plaintiffs visa application to completion.

**THIRD CAUSE OF ACTION**
**Writ of Mandamus**
**(As against all Defendants)**

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 51

245.    The allegations set forth in all preceding paragraphs are repeated and incorporated as if fully set forth herein.

246.    The Mandamus Act authorizes district courts, at their discretion, to compel an agency to perform a nondiscretionary duty owed to the plaintiff, after the plaintiff has exhausted all other avenues of relief. 28 U.S.C. § 1361; *see City of New York v. Heckler*, 742 F.2d 729, 739 (2d Cir. 1984).

247.    The requirements for issuance of a writ of mandamus are: "(1) a clear right in the plaintiff to the relief sought; (2) a plainly defined and peremptory duty on the part of the defendant to do the act in question; and (3) no other adequate remedy available." *Anderson v. Bowen*, 881 F.2d 1, 5 (2d Cir. 1989).

248.    Mandamus is warranted because Plaintiffs have a clear right to have their visa application processed in accordance with the rules and procedures governing the adjudication of visa applications. 8 US.C. § 1202(b) ("All immigrant visa applications shall be reviewed and adjudicated by a consular officer").

249.    Second Mandamus is warranted given Defendants bad faith adjudication of Noor's brother's visa application and subject the Alumari family to separate more rigorous visa adjudication standards in violation of the INA' non-discrimination clause.

250.    Third, mandamus is warranted given that Noor husband has been murdered by rebels in Yemen – a failed state where Noor, Yousef and their families remained trapped dispute their eligibility to immigrate to the United States and reside here safely with their other family members.

251. Plaintiff, Mr. Alumari and his family have already suffered enormous loss through the delay of their visa applications in that Noor's husband was murdered in Yemen by Houthi's rebels; a situation entirely foreseeable given the humanitarian crisis in Yemen.

252. It is also a situation which was entirely avoidable if Defendants had simply performed their required duties in the timely normal fashion.

253. Accordingly, the exercise of mandamus power vested in this Court by 28 U.S.C. § 1361 is warranted.

254. Plaintiff requests that this court mandate that the United States Embassy in Djibouti complete the adjudication of Noor and her family's visa applications in good faith and in accordance with the laws of the United States.

### FOURTH CAUSE OF ACTION
### Bad Faith Denial of Immigrant Visa
### (As against all Defendants)

255. The allegations set forth in all preceding paragraphs are repeated and incorporated as if fully set forth herein.

256. Defendants' denial of Youseff's visa is based on an erroneous application of law that runs counter to the controlling case law.

257. This erroneous application is part of the development of a discriminatory standard only applied to visa applicants of Yemini race, ethnicity, and or national origin.

258. Defendants are well aware that the facts relating to the Youseff's 2004 visa application are not a material misrepresentation or fraud.

259. First, Youseff's use of different biography information was only subsequently discovered in the 2019-2023 immigrant visa proceeding; thus, the B-2 visa could

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 53

not have been refused due to this information because the information that was not available to the consular officer in 2004.

260.    9 FAM 402.2-2(B)(1) provides that "[i]n determining whether visa applicants are entitled to temporary visitor classification [B-2], you must assess whether applicants (a) Have a residence in a foreign country, which they do not intend to abandon; (b) Intend to enter the United States for a period of specifically limited duration; and (c) Seek admission for the sole purpose of engaging in legitimate activities relating to business or pleasure."

261.    9 FAM 402.2-2(B)(2) further states that "[i]f an applicant for a B-1/B-2 visa fails to meet one or more of the above criteria, you must refuse the applicant under **section 214(b) of the INA**."

262.    None of the three factors considered under 214(b) relate to biographic information.

263.    Youseff was eligible for a B-2 visa regardless of his date of birth, relationship to his grandparents, or his name; as at the time of the visa application Youseff was a non-American applying for a non-immigrant visitor visa, for which he was eligible under the true facts.

264.    Next, as to the question of whether a misrepresentation that occurred in 2004 could now be viewed as material with the information subsequently discovered in 2019, the answer under the controlling law is emphatically: no.

265.    The FAM strictly defines a material misrepresentation for purpose of inadmissibility/ineligibility as "**(1)** [t]he alien is ineligible on the true facts; or **(2)** '[T]he misrepresentation tends to shut off a line of inquiry which is relevant to the alien's eligibility and

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 54

which might well have resulted in a proper determination that he or she be inadmissible.'"9 FAM 302.9-4(B)(5)  (citing *Matter of S- and B-C*, 9 I. & N. Dec. 436, at 447).  This is also often referred to as 'The Rule of Probability.'" *Id.*

266.    Youseff was still eligible under the true facts as a B-2 tourist visa does not rely on his relationship to a specific United States individual – his grandparents or his parents – or Youseff's full and correct name and age, Youseff was not not ineligible under the true facts. 9 FAM 302.9-4(B)(5)  (citing *Matter of S- and B-C*, 9 I. & N. Dec. 436, at 447).

267.    Next, Youseff did not make a material misrepresentation under the Rule of Probability, which requires both a find that a misrepresentation "tends to shut off a line of inquiry" (first prong) and "which might well have resulted in a proper determination that he or she be inadmissible" (second prong).  *See Cal. v. Altus Fin. S.A.*, 540 F.3d 992, 1008 (9th Cir.2008) ("Ordinarily, when the word 'and' appears in a list of requirements, it is conjunctive and indicates that all requirements must be satisfied.").

268.    As to the "tends to shut off a line of inquiry," 9 FAM 302.9-4(B)(5)(c)(2)(a) provides that "[i]f an alien was found ineligible for a visa under a different and unrelated ground of ineligibility (for example under INA 214(b)) a **subsequent discovery** that the alien had misrepresented certain aspects of the case **_would not be considered material_ since the misrepresented facts did not tend to lead you into making an erroneous conclusion**."

269.    Here, the B-2 visa in 2004 fits squarely into the above description as the refusal was based on the same legal provision, 8 U.S.C. § 1184(b) (INA 214(b).

270.    Defendants are fully aware of the rule in 9 FAM 302.9-4(B)(5)(c)(2)(a) that subsequent discoveries of misrepresentations in cases denied pursuant to INA 214(b) are

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 55

immaterial because the "misrepresented facts did not tend to lead you into making an erroneous conclusion."

271.    Defendants thus simply ignored the controlling legal principles required to be applied in this matter and issued an inadmissibility finding that is knowingly contrary to the controlling legal standards.

272.    Simply out, "before the misrepresentation was discovered," the B-2 visa in 2004 was refused because Youseff "**could not, on the known facts, qualify as a non-immigrant**." Then, "The subsequent discovery" of the Beneficiary's name, date of birth, and relationship, "would not support a finding of **materiality** because it **had no bearing** on the properly-resolved adjudication of the case." 9 FAM 302.9-4(B)(5)(c)(2)(a).

273.    This approach has been confirmed by *Kungys* v. *United States*, 485 U.S. 759 (1988), where the Supreme Court provided that the test of whether "concealments or misrepresentations [are] material is whether they ha[ve] a natural tendency to **influence the decisions of the Immigration and Naturalization Service**." *Id*. at 772 (emphasis added); *see United States v. Puerta*, 982 F.2d 1297, 1303-04 (9th Cir.1992).

274.    Finally, 9 FAM 302.9-4(B)(5)(c)(5) provides that "[i]n order to sustain a finding of materiality, it must be shown that the misrepresentation was of basic significance to the alien's eligibility for a visa. In other words, the information concealed by the misrepresentation … have been … crucial to a final decision of the alien's eligibility to receive a visa."

275.    Here, the correct name, date of birth, and the relationship would not have disclosed "a situation wherein the alien is actually ineligible for a visa as a matter of law." 9

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 56

FAM 302.9-4(B)(5)(b). In other words, the use of the different name and date of birth did not conceal a ground of ineligibility.

276. The B-2 visa is decided on the factors laid out in 9 FAM 402.2-2(B)(1), which were identified and properly considered during the 2004 nonimmigrant visa interview.

277. Accordingly, Defendants could not have believed the facts relied upon in making this determination.

**FIFTH CAUSE OF ACTION**
**Violation of Fifth Amendment Equal Protection**
(**As against all Defendants**)

278. The allegations set forth in all preceding paragraphs are repeated and incorporated as if fully set forth herein.

279. The Due Process Clause of the Fifth Amendment of the United States Constitution provides that "No person shall…be deprived of life, liberty, or property, without due process of law." This Clause contains an equal protection component which prohibits the Federal Government from denying equal protection of the laws.

280. The "Due Process Clause of the Fifth Amendment forbids the Federal Government to deny equal protection of the laws." *Davis v. Passman*, 442 U.S. 228, 234 (1979) (quoting *Vance v. Bradley*, 440 U.S. 93, 94 n.1, (1979) ); *see also United States v. Windsor* , 570 U.S. 744 (2013) ("The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws."); *see also*, *Bolling v. Sharpe*, 347 U.S. 497 (1954).

281. The "government harms minority individuals, and violates the Equal Protection Clause . . . `[w]hen the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group.'" *Lewis v.*

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 57

*Thompson*, 252 F.3d 567, 590 (2d Cir. 2001) (quoting *Comer v. Cisneros,* 37 F.3d 775, 793 (2d Cir. 1994) (quoting *Northeastern Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville,* 508 U.S. 656, 666 (1993)).

282.    "The equal protection clause protects against the government's treating individuals differently from other similarly situated individuals." *Doe v. Trump*, 275 F. Supp. 3d 167, 207-8 (D.D.C. 2017) (citing *George v. Napolitano*, 693 F. Supp. 2d 125, 131 (D.D.C. 2010) (citing *Women Prisoners of the D.C. Dep't of Corr. v. Dist. of Columbia,* 93 F.3d 910, 924 (D.C. Cir. 1996).

283.    For example, "[t]he Constitution does 'not permit an immigration official, in the absence of [lawful quota] policies, to . . . discriminate on the basis of race and national origin." *Abdullah v. I.N.S*, 184 F.3d 158, 166-67 (2d Cir. 1999) (citing *Bertrand v. Sava*, 684 F.2d 204, 212 n. 12 (2d Cir. 1982); *Wong Wing Hang v. INS*, 360 F.2d 715, 719 (2d Cir. 1966) (Friendly, J.) (denial of suspension of deportation to eligible alien would be abuse of discretion if it "rested on an impermissible basis such as an invidious discrimination against a particular race or group")).

284.    "Indeed, '[i]mmigration enforcement that is based not on individualized suspicion but on ethnic generalizations teeters on the verge of 'the ugly abyss of racism.'" *Zuniga-Perez v. Sessions*, 897 F.3d 114, 127 (2d Cir. 2018) (quoting *Maldonado v. Holder*, 763 F.3d 155, 174 (2d Cir. 2014) (quoting *Korematsu v. United States,* 323 U.S. 214, 233 (1944) (Murphy, J., dissenting).

285.    A violation of Equal Protection occurs when "invidious discriminatory purpose was a motivating factor" in a relevant government decision or action. *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U. S. 252, 266 (1977).

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 58

286. Thus, Defendants may not "apply neutral regulations to discriminate on [the basis of race and national origin]" by adopting heightened adjudication requirements for Yemeni Petitioners to prove their familial relationships while other United States citizens are not subject to the heightened standards.

287. Under *Arlington Heights*, "possible evidence of such discrimination includes disparate impact on a particular group, '[d]epartures from the normal procedural sequence,' and 'contemporary statements by members of the decisionmaking body'; as well as the "specific sequence of events leading up to the challenged decision.'"*Doe v. Trump*, 275 F. Supp. 3d 167, 212 (D.D.C. 2017) (*quoting Arlington Heights*,429 U. S. at 266–268).

288. Further, an equal protection violation can occur where the challenged policy is "extremely overbroad when considered in the light of their proffered justifications." *Doe v. Trump*, 275 F. Supp. 3d 167, 212 (D.D.C. 2017) (citing *Romer v. Evans*, 517 U.S. 620, 632(1996) (holding that law's "sheer breadth is so discontinuous with the reasons offered for it that [it] seems inexplicable by anything but animus toward the class it affects")).

289. Here, Defendants have discriminatorily adopted and/or applied policies, procedures, guidance, and adjudication standards to the processing and adjudication of visa petitions, and corresponding immigrant visa applications based on the Yemeni race and/or national origin of petitioners and beneficiaries, where such policies, procedures, guidance, and adjudication standards are not applied to the petitions and visa application processing and adjudication of petitions and corresponding visa applications of all other similarly situated petitioners and visa applicants of all races and/or national origins.

290. Further, Defendants have applied otherwise facially neutral policies, procedures, guidance, and adjudication standards in a discriminatory manner causing, but not

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 59

limited to, significant delay, relocation of files, delays in forwarding notices of appeals of denied petitions, for the purpose of delaying and denying visa petitions and immigrant visa applications filed on behalf of beneficiaries of Yemeni race, ethnicity or national origin.

291.   Further, Defendants have further attempted to avoid review of their discriminatory policies not by ceasing their discriminatory practices but by removing mention of specific races and/or national origins from their guidance memoranda, policies, and procedures, but still applying the same discriminatory practices and procedures.

292.   Nonetheless, Defendants do not submit similarly situated petitioners and applicants for immigration benefits of other race and/or national origin to the same requirements as those applied to Yemeni petitioners and applicants.

293.   Additionally, the procedures, processes, standards, rules, guidance, action and inaction, and any other conduct or treatment applied by or taken by Defendants in their processing and adjudication of Yemeni-American immigration benefits represents a drastic departure from the standard procedures applied to all other benefits requests. *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U. S. 252, 266 (1977) (discriminatory intent can be inferred from "[t]he specific sequence of events leading up to the challenged decision" and "[d]epartures from the normal procedural sequence.").

294.   Through the years, Defendants have become more determined to restrict, stymie, and prevent favorable adjudication of immigration benefits for Yemeni applicants, in violation of an express and primary purpose of the Immigration and Nationality Act.

295.   Thus, Defendants have adopted immigration goals, procedures, standards, and practice in contravention of statutory right and procedure, have done so by adopting separate and distinct immigrant visa processing and adjudication procedures and standards which are

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 60

applied only based on the Petitioner or Beneficiary's name, race or national origin, and any other aspect than an officer may deem "suspicious" and have done for so in a discriminatory manner for the purpose of delaying, denying and/or otherwise preventing the adjudication of Yemeni-American visa petitions and Yemeni visa applications.

296.   The procedures and standards applied to the adjudication of Yemeni visa applications are separate and distinct from the procedures applied to all family-sponsored and immediate relative visa applications for non-Yemeni national origin/race/ancestry.

297.   The application of these heightened procedures have caused the delay and/or denial of the Plaintiffs' visa applications.

298.   Plaintiff Mohamed Alumari's has a clear interest in the non-discriminatory adjudication of his relatives' visa applications, as his statutory right to sponsor his relatives to apply for an immigrant visa is protected by the Fifth Amendment's due process clause. *See*, *Ching v. Mayorkas* , 725 F.3d 1149, 1155–59 (9th Cir. 2013); *Zerezghi v. U.S. Citizenship & Immigration Servs.*, 955 F.3d 802, 807 (9th Cir. 2020).

299.   As a result of Defendants discriminatory adoption and application of visa adjudication procedure, policies, and practices, Plaintiff Mohamed Alumari continues to be separated from his family, continues suffer emotional and financial hardship from his family members being trapped in Yemen during the humanitarian disaster that is the current civil war in Yemen.

300.   Accordingly, Defendants have harmed and continue to harm Plaintiffs as a result of violating Plaintiff Mohamed Alumari's right to equal protection under the Fifth Amendment.

## **PRAYER FOR RELIEF**

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 61

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

301.    Declare that Defendants have violated Section 706(1) of the APA by failing to process Plaintiffs visa application at the the United States Embassy Djibouti;

302.    Mandate that Defendants process Plaintiff's beneficiaries' visa applications and schedule a visa interview at the United States Embassy in Djibouti in compliance with Department of State regulations, rules and procedures;

303.    Declare Defendants have violated the INA non-discrimination clause;

304.    Declare that Defendants have violated Plaintiff Mohamed Alumari's Fifth Amendment right to Equal Protection;

305.    Declare Defendants have denied Plaintiff-Beneficiaries Yousef Alumari's immigrant visa application in bad faith;

306.    Mandate that Defendants re-adjudicate Plaintiff-Beneficiary Yousef Alumari and his family's visa applications in good faith and in accordance with the laws of the United States;

307.    Maintain jurisdiction over this matter to ensure compliance with the orders of this Court;

308.    Grant any other such relief as the Court may deem just and proper.


Dated: August 21, 2023

Respectfully submitted,

*/s/ Julie A. Goldberg*
Julie A. Goldberg, Esq.
Goldberg & Associates, P.C.
*Attorney for Plaintiffs*

COMPLAINT FOR MANDAMUS, DECLARATORY AND INJUNCTIVE RELIEF - 62